# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.:  22-332 (RC) |
| | : | |
| ANTONIO EMORY WILLIAMS, | : | Re Document No.:    17 |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### DENYING DEFENDANT'S AMENDED MOTION TO SUPPRESS TANGIBLE EVIDENCE

## I.  INTRODUCTION

In October 2022, Defendant Antonio Emory Williams was indicted by a grand jury of violating 18 U.S.C. § 922(g)(1) for unlawful possession of a firearm and ammunition after having previously been convicted of a crime punishable by imprisonment for a term exceeding one year.  *See* Indictment at 1, ECF No. 1.  The charge against Mr. Williams arose from his arrest at the Hopkins Apartments in Washington, D.C. on September 20, 2022, during which a police officer searched a backpack that contained a firearm, ammunition, and Mr. Williams's photo identification.  *See* Gov't's Mem. Supp. Pretrial Detention at 1–2, ECF No. 3.  Mr. Williams now brings an amended motion to suppress the tangible evidence seized on September 20, 2022.  *See* Def.'s Am. Mot. to Suppress Tangible Evid. ("Def.'s Mot."), ECF No. 17.[1]  For the reasons detailed below, the Court denies Mr. Williams's amended motion to suppress.

---

[1] Mr. Williams's original motion to suppress misidentified the officer who first located the backpack at issue.  The only difference between Mr. Williams's original and amended motions is the change in the officer's name.  Def.'s Mot. at 1 n.1.

## II.  FACTUAL BACKGROUND

On September 20, 2022, officers with the Metropolitan Police Department of the District of Columbia ("MPD") observed Mr. Williams standing outside of an entrance to the Hopkins Apartments, *see* Gov't's Mem. Supp. Pretrial Detention at 1, a D.C. Housing Authority ("DCHA") public housing complex in Southeast Washington, D.C., *see* Gov't's Opp'n to Mot. to Suppress Tangible Evid. ("Gov't's Opp'n") at 1, ECF No. 18.  According to the Government, one of the MPD officers, Officer Ivens Thermidor, recognized Mr. Williams because he had arrested Mr. Williams at the Hopkins Apartments for the charge of carrying a pistol without a license in 2021.  *See id.* at 1–2.  Officer Thermidor also believed that Mr. Williams had been barred from the Hopkins Apartments.  *See id.* at 2.  Mr. Williams had been the subject of a DCHA Bar Notice, issued in November 2019, that prohibited Mr. Williams from entering the "[e]ntire property" and the "[e]ntire block" of the Hopkins Apartments for five years.  Ex. 2 to Gov't's Opp'n.[2]

After following Mr. Williams into the Hopkins Apartments, the MPD officers stopped and handcuffed Mr. Williams in a hallway on the second floor.  *See* Def.'s Mot. at 1–2.  Mr. Williams had been holding a black grocery bag that he dropped onto the ground.  *See id.* at 2.  Mr. Williams stated that the black grocery bag contained marijuana.  *See* Ex. 1 to Gov't's Opp'n at 2:36–2:37; *id.* at 2:41–2:42.  Mr. Williams also had in his possession three oxycodone pills.  *See* Gov't's Opp'n at 5.  Shortly after the officers detained Mr. Williams on the second floor, one of the officers, Officer Joseph Solem, found an unattended backpack in the third floor hallway.  *See* Def.'s Mot. at 2; Gov't's Opp'n at 3.  As Officer Solem walked up the stairwell and

---

[2] Exhibits submitted by the Government and Mr. Williams were shared with the Court electronically.

approached the backpack, he asked Mr. Williams, "Is this your backpack right here?"  Ex. 1 to
Gov't's Opp'n at 3:04–3:05.  Mr. Williams replied, "Nah."  *Id.* at 3:06.  Officer Thermidor then
said, "Check it out, check it out.  If it's not his, we can check it."  *Id.* at 3:08–3:11.  Officer
Brattain, who was detaining Mr. Williams, also said in response to Mr. Williams, "It's not?
That's abandoned property then."  *Id.* at 3:09–3:12.  Mr. Williams then asked, "What you mean?
What is you talking about, huh?  What is you talking about?  What is y'all doing?"  *Id.* at 3:13–
3:18.  Officer Thermidor then said, "You said that's not yours, right?"  *Id.* at 3:18–3:19.  Officer
Brattain also said, "You said it's not your backpack."  *Id.* at 3:19–3:20.  At the same time, Mr.
Williams reiterated, "What is y'all talking, what is y'all doing with my stuff?"  *Id.* at 3:21–3:23.
As he asked what the officers were doing "with [his] stuff," he tried to move toward the
stairwell, but was restrained from doing so by Officers Thermidor and Brattain.  *See id.*
Appearing to gesture toward the black grocery bag on the ground, Mr. Williams then also asked
the officers, "Why is you messing with my stuff?  What is you doing?"  *Id.* at 3:24–3:26.

As this was occurring, Officer Solem, without a warrant, opened one pocket of the
backpack and rifled through its contents.  *See* Ex. 1 to Def.'s Mot. at 00:17–00:28; Def.'s Mot. at
2.  When Officer Solem brought the backpack down from the third floor and into Mr. Williams's
view, Officer Solem asked, "You said this *is* yours?"  Ex. 1 to Def.'s Mot. at 00:41–00:42.
Officer Brattain then interjected, "No, no.  No.  No, he said it's not his."  Ex. 1 to Gov't's Opp'n
at 3:41–3:46.  Officer Solem then opened the backpack again after placing it on the stairwell next
to the second floor hallway.  *See* Ex. 1 to Def.'s Mot. at 00:50–00:54.  As Officer Solem opened
the backpack, Mr. Williams then shouted again, "What you doing?"  Ex. 1 to Gov't's Opp'n at
3:50–3:51.  He also again moved toward the stairwell toward Officer Solem and the backpack,
but was restrained.  *See id.*  As Mr. Williams shouted for someone named "Charlene" and yelled

that the officers were "violating" him, Officer Thermidor went to the backpack, rifled through the contents of the open pockets, and opened an additional pocket that contained a gun.  Ex. 1 to Gov't's Opp'n at 3:52–4:47.  The backpack contained Mr. Williams's photo identification and "a loaded Glock 33 semi-automatic firearm with one round in the chamber and 19 rounds in a high-capacity magazine capable of receiving 22 rounds."  Gov't's Opp'n at 4.  Per the Government, "[t]he firearm included a Giggle switch that [the Bureau of Alcohol, Tobacco, Firearms and Explosives] has since confirmed rendered the firearm fully-automatic."  *Id.* at 5.

As the officers stood outside with Mr. Williams, Officer Thermidor asked another officer, "Did we get anything on the return yet?"  Ex. 1 to Gov't's Opp'n at 7:08–7:09.  After an officer responded, Officer Thermidor then appears to have said, "[H]e bars from here anyway."  *Id.* at 7:16–7:17.  After an exchange with Officer Thermidor about what he meant by that statement, Mr. Williams asked, "But still, why is you messing with me?"  *Id.* at 7:18–7:21.  Officer Thermidor replied, "You're barred from here."  *Id.* at 7:22.  Mr. Williams responded, "I'm not barred . . . ."  *Id.* at 7:23.  Officer Thermidor then said, "Yeah, for the gun charge."  *Id.* at 7:23–7:25.  Later, Officer Thermidor stated to another officer, "I got him for [*unintelligible*] here, same spot . . . . No, contact the court.  I think the judge bar him from this location . . . ."  *Id.* at 8:52–9:12; *see also* Ex. 4 to Def.'s Mot.  A Weapon Recovery Information Intake Form submitted by Officer Thermidor stated that the gun at issue in this case was recovered as a result of a "[s]earch incident to arrest . . . from the defendant backpack pocket after he was placed under arrest for unlawful entry."  Ex. 5 to Def.'s Mot. at 1.

Mr. Williams was charged by complaint in D.C. Superior Court in September 2022, with Unlawful Possession of a Firearm (Prior Conviction).  *See* Gov't's Mem. Supp. Pretrial Detention at 2.  He was then indicted in the U.S. District Court for the District of Columbia in

October 2022 on one count of Unlawful Possession of a Firearm and Ammunition by a Person

Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation

of 18 U.S.C. § 922(g)(1).  *See* Indictment at 1.  Mr. Williams now brings an amended motion to

suppress the tangible evidence seized—namely, the marijuana, oxycodone pills, and the contents

of the backpack, including the firearm—as part of his arrest on September 20, 2022.  *See*

*generally* Def.'s Mot.  Following an evidentiary hearing on Mr. Williams's motion on January

19, 2023, the parties submitted supplemental briefs to the Court.  *See generally* Def.'s Suppl. Br.

in Supp. of Mot. to Suppress Tangible Evid. ("Def.'s Suppl. Br."), ECF No. 27; Gov't's Suppl.

Br., ECF No. 28; Def.'s Resp. to Gov't's Suppl. Br. ("Def.'s Resp."), ECF No. 29.

### III.  LEGAL STANDARD

"In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court carved out an exception to the

warrant requirement of the Fourth Amendment," *United States v. Edmonds*, 240 F.3d 55, 59

(D.C. Cir. 2001), and set forth "that an officer may, consistent with the Fourth Amendment,

conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that

criminal activity is afoot," *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  The officer must,

however, "be able to articulate more than an 'inchoate and unparticularized suspicion or hunch'

of criminal activity."  *Id.* at 123–24 (quoting *Terry*, 392 U.S. at 27) (cleaned up).  "[G]enerally,

'[a] *Terry* stop must (1) last no longer than is necessary to effectuate the purpose of a stop and

(2) employ the least intrusive means reasonably available to verify or dispel the officer's

suspicion.'" *United States v. Devaugh*, 422 F. Supp. 3d 104, 114 (D.D.C. 2019) (quoting *United*

*States v. Smith*, 373 F. Supp. 3d 223, 238 (D.D.C. 2019)) (cleaned up).  Thus, "a stop that is

unduly prolonged or intrusive transforms from an investigative stop into an arrest requiring

probable cause." *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017).  Even so,

"the use of handcuffs during a *Terry* stop does not automatically convert it into an arrest since 'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 82 (D.D.C. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

"When the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure." *United States v. Jones*, 142 F. Supp. 3d 49, 56 (D.D.C. 2015) (quoting *United States v. Sheffield*, 799 F. Supp. 2d 22, 28 (D.D.C. 2011)).  The proponent of a motion to suppress first "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Jones*, 374 F. Supp. 2d 143, 147 (D.D.C. 2005) (quoting *Rakas v. Ill.*, 439 U.S. 128, 132 n.1 (1978)).  Once the "defendant produces evidence that he was arrested or subjected to a search without a warrant," however, "the burden shifts to the government to justify the warrantless arrest or search." *Id.* (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)).

## IV.  ANALYSIS

Mr. Williams contends that, because the officers lacked either a reasonable, articulable suspicion for his seizure or the necessary probable cause for his arrest, the evidence seized from the arrest—the black grocery bag containing marijuana, oxycodone pills, and the contents of the backpack, including the firearm—must be suppressed.  *See* Def.'s Mot. at 3–5.  In addition, Mr. Williams argues, the warrantless search of the backpack exceeded the limits set by *Terry* and was thus unlawful.  *Id.* at 5–6.  The Government disagrees.  First, the Government states, the officers' stop of Mr. Williams was justified not only because Mr. Williams fled from the officers unprovoked, but also because Officer Thermidor had arrested Mr. Williams at the same location the year prior in another gun possession case.  Gov't's Opp'n at 6–7.  According to the

Government, the officers then also had probable cause to arrest Mr. Williams for unlawful entry on the grounds of the Hopkins Apartments, due to the Bar Notice prohibiting him from the property. *Id.* at 1–2. Second, the Government contends, because Mr. Williams had abandoned the backpack prior to his seizure by the officers, it was not accorded any protections under the Fourth Amendment. *Id.* at 7–10.

The Court agrees with the Government that the officers had the necessary probable cause to arrest Mr. Williams. It is undisputed that the officers personally observed Mr. Williams violate the Bar Notice through his presence on the property of the Hopkins Apartments, making him subject to arrest for unlawful entry. The Court therefore rejects Mr. Williams's claim that the oxycodone pills, the black grocery bag and marijuana, and the contents of the backpack, including the firearm, should be excluded as evidence based on the unlawfulness of his arrest. Further, the Court finds that, because Mr. Williams abandoned the backpack before his seizure, the searches of the backpack by Officers Solem and Thermidor without a warrant were lawful.

### A. Arrest of Mr. Williams

Although neither party initially contested that the officers arrested Mr. Williams, *see* Def.'s Mot. at 3 ("Mr. Williams was arrested at the point that Officer Thermidor stopped him"); Gov't's Opp'n at 6–7, Mr. Williams now suggests that, per Officer Brattain's testimony during the Court's evidentiary hearing on January 19, 2023, he may not have in fact been under arrest at the time of the officers' search, *see* Def.'s Suppl. Br. at 1–2 (noting Officer Brattain's testimony that he believed Mr. Williams to have been "just detained"); Def.'s Resp. at 2. Indeed, "[t]he point at which an investigative stop becomes an arrest is not marked with a bright line" but "the [Supreme] Court has 'emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.'" *United*

*States v. Leake*, No. 19-cr-194, 2020 WL 3489523, at *10 (D.D.C. June 26, 2020) (quoting *Hall*,

867 F.3d at 153). "[P]hysical contact does not, in and of itself, convert a *Terry* stop into an

arrest." *Id.* (collecting cases). Instead, to determine whether a seizure is a stop or arrest, a court

must consider "the officer's intent in stopping the citizen; the impression conveyed to the citizen

as to whether he was in custody or only briefly detained for questioning; the length of the stop;

the questions, if any, asked; and the extent of the search, if any, made." *United States v. White*,

648 F.2d 29, 34 (D.C. Cir. 1981) (citations omitted).

Here, the Court finds that Officer Thermidor's seizure of Mr. Williams—by stopping him

on the second floor and grabbing him by the arms and torso—constituted an arrest. *See* Ex. 1 to

Gov't's Opp'n at 1:51–2:14. Given the Government's representations that Officer Thermidor

pursued Mr. Williams on sight because he believed Mr. Williams to have been barred from the

Hopkins Apartments, it seems unlikely that Officer Thermidor stopped Mr. Williams to merely

briefly detain him for questioning. And certainly, once Mr. Williams was handcuffed by the

officers, who then held him by the arms and prevented him from leaving or even moving a few

steps, it would have been reasonable for Mr. Williams to understand that he had been arrested,

rather than stopped. The question presented to the Court, then, is whether the officers had

probable cause to arrest Mr. Williams. *See Hall*, 867 F.3d at 153.

The Court concludes that the officers' arrest of Mr. Williams complied with the Fourth

Amendment because they had probable cause to arrest him. "Probable cause to arrest exists only

'if a reasonable and prudent officer would conclude from the totality of the circumstances that a

crime has been or is being committed.'" *United States v. Smith*, 373 F. Supp. 3d 223, 242

(D.D.C. 2019) (quoting *United States v. Holder*, 990 F.2d 1327, 1328 (D.C. Cir. 1993)). Under

14 D.C. Municipal Regulations § 9600, "[n]o person may enter upon a DCHA property unless

that person is authorized to be on the property" and "[a]ny person not identified in § 9600.2 as an authorized person may be subject to the issuance of a Bar Notice for the period of time specified in the Bar Notice, not to exceed five years."  14 D.C.M.R. §§ 9600.2, 9600.4.  If a "barred person . . . later returns to the DCHA property noted on the Bar Notice at any time while the Bar Notice is in effect, the person may be arrested for 'unlawful entry' pursuant to D.C. Code § 22-3302 (2001 ed.) as amended."  *Id.* § 9600.10.  Accordingly, through his mere presence on the property of the Hopkins Apartments, Mr. Williams was in violation of the D.C. regulations setting out those who may lawfully be on DCHA property and of the DCHA Bar Notice issued against him, and was therefore subject to arrest under D.C. Code § 22-3302.[3]

To establish the crime of unlawful entry under D.C. Code § 22-3302, the Government "must demonstrate '(1) entry that is (2) unauthorized—because it is without lawful authority and against the will of the owner or lawful occupant.'"  *Cartledge v. United States*, 100 A.3d 147, 149 (D.C. 2014) (quoting *Ortberg v. United States*, 81 A.3d 303, 307 (D.C. 2013)).  In establishing "the mental state with respect to acting against the will of the owner or lawful occupant," the Government need only prove "that the defendant knew or should have known that his entry was unwanted"—that is, "that the 'will' of a lawful occupant was objectively manifest through either express or implied means, not that the will was subjectively understood by the defendant."  *Ortberg*, 81 A.3d at 308; *see also McGovern v. George Washington Univ.*, 245 F.

---

[3] Although Mr. Williams notes that he "does not concede" that the Bar Notice is valid, he has not raised any arguments as to why it should be considered invalid and may not serve as the basis for an arrest for unlawful entry.  Def.'s Resp. at 2 n.1.  Mr. Williams also does not contest that he was on the property, *see* Def.'s Suppl. Br. at 12 (stating that "Mr. Williams stood outside the only entrance to the building"), nor does he argue that he only ventured onto the property or into the building as a result of the officers' pursuit, *see id.* at 10 ("There is not even clear evidence to support a finding that Mr. Williams went into the apartment building because he saw the police, rather than because he was trying to talk to his friend Charlene.").

Supp. 3d 167, 185 (D.D.C. 2017), *aff'd sub nom. McGovern v. Brown*, 891 F.3d 402 (D.C. Cir. 2018). Given that the officers themselves observed Mr. Williams's presence on the property of the Hopkins Apartments without authority as set out in 14 D.C.M.R. § 9600 and in contravention of the Bar Notice, they had probable cause to arrest Mr. Williams for unlawful entry.[4] *See, e.g.*, *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

Mr. Williams objects that, at the time of Officer Thermidor's seizure of Mr. Williams, "he only *thought* that Mr. Williams might be barred" from the Hopkins Apartments due to Mr. Williams's arrest in 2021, and that "[t]hinking someone is barred is not sufficient for probable cause." Def.'s Resp. at 2 (emphasis in original); *see also* Def.'s Mot. at 5 ("Officer Thermidor's thought [that Mr. Williams was barred from the Hopkins Apartments] is nothing more than a mere hunch that criminal activity was occurring and was not sufficient to justify a *Terry* stop, let alone the arrest of Mr. Williams."). Mr. Williams also notes that Officer Thermidor was "incorrect" in his belief because Mr. Williams had not in fact been barred from the property by DCHA as a result of his arrest in 2021, and Officer Thermidor "merely got lucky that an earlier barring notice, of which he had no knowledge, was on file with [DCHA]." Def.'s Resp. at 2; Def.'s Mot. at 2.

---

[4] It is irrelevant that Mr. Williams was eventually charged not with unlawful entry, but "Unlawful Possession of a Firearm (Prior Conviction)," and was indicted for a violation of 18 U.S.C. § 922(g)(1). Gov't's Opp'n at 5. "An arrest is valid even if probable cause existed only for a crime different than the one actually charged." *Plummer v. District of Columbia*, 317 F. Supp. 3d 50, 60 (D.D.C. 2018) (citing *United States v. Bookhardt*, 277 F.3d 558, 564–67 (D.C. Cir. 2002)).

The Court addresses the latter argument first.  Based on the Court's review of the evidence, it appears that Officer Thermidor believed that the *court* that adjudicated Mr. Williams's case in 2021, rather than DCHA, had barred Mr. Williams from the property.  *See* Ex. 1 to Gov't's Opp'n at 8:52–9:12.  Neither party has addressed the possibility that Mr. Williams may have been barred from the Hopkins Apartments by a judge, and the Court has been unable to either substantiate or disprove Officer Thermidor's belief.  But the question of whether Officer Thermidor was correct in his belief is ultimately irrelevant.  The Supreme Court "repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *see also Heien v. North Carolina*, 574 U.S. 54, 61 (2014) ("We have recognized that searches and seizures based on mistakes of fact can be reasonable.").  Thus, "the constitutionality of an arrest does not depend on the arresting officer's state of mind."  *Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006); *see also A.M. v. Holmes*, 830 F.3d 1123, 1139 (10th Cir. 2016) ("Neither the officer's subjective beliefs nor information gleaned post-hoc bear on this [probable cause] inquiry." (quoting *Manzanares v. Higdon*, 575 F.3d 1135, 1144 (10th Cir. 2009)).  That is, "[p]robable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information."  *Pierre v. City of New York*, No. 18-cv-5438, 2019 WL 7293390 (E.D.N.Y. Dec. 30, 2019), *aff'd sub nom. Pierre v. The City of New York*, 860 F. App'x 14 (2d Cir. 2021) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).

In *Apodaca*, for instance, the Tenth Circuit rejected the plaintiff's argument that her "arrest was unlawful because the arresting officer did not have probable cause to arrest her for the offense with which he charged her." 443 F.3d at 1287. Following a high-speed police chase of the plaintiff's car—which the plaintiff's former boyfriend had been driving and had used to attempt to ram a police car—the plaintiff informed officers that she had a nonmutual restraining order against her former boyfriend. *Id.* at 1288. Although the plaintiff alleged that she gave the officers a copy of the restraining order stating that the restraining order was not mutual, one of the officers nonetheless arrested the plaintiff for violating the restraining order. *Id.* The defendants argued that even if the officer "did not have probable cause to arrest [the plaintiff] for violation of the restraining order, he had probable cause to believe that she was an accessory or aider and abettor to the various crimes committed by [her former boyfriend] while she was a passenger in the car." *Id.* The Tenth Circuit agreed that it was "constitutionally irrelevant that [the officer's] reason for arresting her was his incorrect belief that she had violated a restraining order" because "[a]ll that matter[ed] [was] whether he possessed knowledge of evidence that would provide probable cause to arrest her on *some* ground." *Id.* at 1289. "An arrest is not invalid under the Fourth Amendment simply because the police officer subjectively intended to base the arrest on an offense for which probable cause is lacking," the Tenth Circuit explained, "so long as 'the circumstances, viewed objectively, justify' the arrest." *Id.* (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). Thus, as established by the Supreme Court, "the subjective intent of the officer—*i.e.*, his reason for making the arrest—cannot be used to invalidate an otherwise legitimate arrest." *United States v. Turner*, 553 F.3d 1337, 1344 (10th Cir. 2009) (citing *Devenpeck*, 543 U.S. at 153–55). Likewise, here, it is constitutionally irrelevant that Officer Thermidor's arrest of Mr. Williams may have been based on an incorrect belief that Mr.

Williams was barred by a court from being on the Hopkins Apartments property.  Even if Officer

Thermidor was mistaken in his understanding of why Mr. Williams was barred from the

property, such a "reasonable mistake of fact does not defeat his determination of probable

cause." *Clem v. Jenkins*, No. 3:18CV00049, 2019 WL 181124, at *4 (W.D. Va. Jan. 11, 2019)

(citing *United States v. Williams*, 85 F. App'x 341, 347 (4th Cir. 2004)).  The relevant point is

that Officer Thermidor possessed the requisite knowledge of evidence providing probable cause

to arrest Mr. Williams "on *some* ground" because he observed Mr. Williams on the property, and

Mr. Williams's presence on the property constituted unlawful entry.  *Apodaca*, 443 F.3d at 1289

(emphasis in original).

For the same reasons, contrary to Mr. Williams's contention that Officer Thermidor had a

mere "hunch" that was "insufficient to support an arrest," Officer Thermidor had, as the Court

concluded above, more than a hunch: he had probable cause.  Def.'s Mot. at 4.  And to the extent

that Mr. Williams argues that Officer Thermidor could not have arrested Mr. Williams unless he

knew that Mr. Williams had violated a specific law by being on the Hopkins Apartments

property, that is not required for probable cause.  "An officer need not have in mind the specific

charge on which the arrest can be justified." *Dominguez v. City of Seattle*, No. C05-1400, 2006

WL 2527626, at *4 n.3 (W.D. Wash. Aug. 30, 2006); *see also Colucci v. City of Aurora Police

Dep't*, No. 5:07 CV 1789, 2007 WL 4365397, at *3 (N.D. Ohio Dec. 11, 2007) ("An officer's

knowledge of the precise crime committed is not necessary to a finding of probable cause.").  In

this case, the Court concludes that the officers met the constitutional standard for arresting Mr.

Williams.

In sum, the Court finds that the officers' arrest of Mr. Williams was lawful.  Because Mr.

Williams argues for the suppression of the oxycodone pills and the black grocery bag and its

contents based only on the unlawfulness of his stop and arrest, and raises no other objections, the Court has not identified any reason to exclude those items as evidence.

### B.  Searches of Backpack

### 1.  Search Incident to Arrest

The Government argues in supplemental briefing that the Court need not reach the question of whether Mr. Williams abandoned his backpack because, in the alternative, the officers' searches of the backpack was permissible under the search incident to arrest exception. *See* Gov't's Suppl. Br. at 1 n.1.  But under this exception to the Fourth Amendment's warrant requirement, an officer may only search "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."  *Chimel v. California*, 395 U.S. 752, 763 (1969); *see also United States v. Wills*, 316 F. Supp. 3d 437, 448 (D.D.C. 2018).  Such a limitation in the scope of this exception "ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy."  *Wills*, 316 F. Supp. 3d at 448 (quoting *Arizona v. Gant*, 556 U.S. 332, 339 (2009)).  Thus, "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply."  *Id.* at 448–49 (quoting *Gant*, 556 U.S. at 339).

The search incident to arrest exception to the Fourth Amendment's warrant requirement does not apply to this case because the backpack was not on Mr. Williams's person or in the area within his immediate control.  As Mr. Williams has emphasized in his supplemental briefing, the backpack was not, when initially discovered on the third floor, even in Mr. Williams's view, let

alone within his reach.  *See* Def.'s Suppl. Br. at 11.  And even after Officer Solem brought the backpack down to the second floor, the officers had restrained Mr. Williams such that he was prevented even from moving towards the staircase.  *See* Ex. 1 to Gov't's Opp'n at 3:21–3:23, 3:50–3:51.  Under such circumstances, "it is inconceivable that [Mr. Williams] could have gained access to" the backpack.  *United States v. Lyons*, 706 F.2d 321, 330–31 (D.C. Cir. 1983); *see also Wills*, 316 F. Supp. 3d at 449.  Thus, the two purposes for the exception—protecting officers and safeguarding evidence from concealment or destruction—are inapplicable here, and the searches of the backpack cannot be justified as searches incident to arrest.

## 2. Abandonment

The Government thus relies on the argument that Mr. Williams abandoned the backpack before his seizure by the officers and thereafter forfeited any expectation of privacy in its contents.  Gov't's Opp'n at 8.  Mr. Williams asserts that he did not abandon the backpack or, in the alternative, that he subsequently reasserted ownership of the backpack such that Officer Thermidor's warrantless search of his backpack was unlawful.  *See* Def.'s Suppl. Br. at 6–17.

The Court agrees with the Government.  "[C]ontraband that is abandoned by a person who is fleeing the police, *before* the person is seized by police, is not 'the fruit of a seizure' and therefore should not be suppressed."  *United States v. Williams*, No. 20-cr-00280, 2021 WL 4521042, at *3 (D.D.C. Oct. 4, 2021) (quoting *California v. Hodari D.*, 499 U.S. 621, 629 (1991)).  Because individuals who abandon property "forfeit any expectation of privacy in it that they might have had," "'a warrantless search or seizure of property that has been abandoned does not violate the Fourth Amendment.'"  *Id.* at *2 (quoting *United States v. Thomas*, 864 F.2d 843, 845 (D.C. Cir. 1989)).  Moreover, "[t]he test to determine whether evidence has been voluntarily abandoned 'is an objective one,' focusing on the intent of the person who is alleged to have

15

abandoned the object, and this 'intent may be inferred from words spoken, acts done, and other objective facts.'" *Id.* (quoting *Thomas*, 864 F.2d at 846). Although the D.C. Circuit will not "treat an item as voluntarily abandoned when a person discards it 'due to the unlawful activities of police officers, as where the disposal was prompted by police efforts to make an illegal arrest or search,'" *United States v. Griffith*, 867 F.3d 1265, 1279 (D.C. Cir. 2017) (citation omitted), "[p]olice pursuit alone 'does not of itself render an abandonment involuntary,'" *Williams*, 2021 WL 4521042, at *3 (quoting *United States v. Brown*, 663 F.2d 229, 231 (D.C. Cir. 1981)).

### a. Denial of Ownership

Mr. Williams abandoned the backpack when he disclaimed ownership of it. As Officer Solem approached the backpack but before he searched it, he asked Mr. Williams, "Is this your backpack right here?" Ex. 1 to Gov't's Opp'n at 3:04–3:05. Mr. Williams replied, "Nah." *Id.* at 3:06. "Courts have long held that, when a person voluntarily denies ownership of property in response to a police officer's question, 'he forfeits any reasonable expectation of privacy in [the property]; consequently, police may search it without a warrant.'" *United States v. Mangum*, 100 F.3d 164, 170 (D.C. Cir. 1996) (alteration in original) (quoting *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990)); *see also United States v. Giles*, 496 F. Supp. 3d 21, 27–28 (D.D.C. 2020). By denying to Officer Solem that the backpack was his, Mr. Williams disclaimed the backpack and forfeited his expectation of privacy in it. *See, e.g.*, *Giles*, 496 F. Supp. 3d at 27; *Lewis*, 921 F.2d at 1303. Moreover, the facts that Mr. Williams lists as to the officers' lack of information about the backpack's ownership—that they never saw Mr. Williams with the backpack or on the third floor and had no reason to believe that he had been there, *see* Def.'s Suppl. Br. at 6—only further support a finding of abandonment because the "objective facts

available to the investigating officers" did not indicate that the backpack belonged to Mr.

Williams, *United States v. Wilkins*, 538 F. Supp. 3d 49, 93 (D.D.C. 2021) (citation omitted).

Mr. Williams argues, however, that he could not have disclaimed the backpack when it

was not even in his view and he could not have known to what backpack Officer Solem was

referring when he denied that the backpack was his. *See, e.g.*, Def.'s Suppl. Br. at 7. The Court

disagrees. As an initial matter, it appears to the Court that this argument is irreconcilable with

Mr. Williams's other arguments that he could not have abandoned the backpack because "he

placed his backpack in a location in the apartment building where he could access it and knew

others would not disturb it . . .," and because "[he] stood outside the only entrance to the building

and would have noticed if anyone tried to leave with his backpack." *Id.* at 12; *see also id.* at 7

("[T]here is no evidence here that Mr. Williams relinquished his backpack, rather than merely

leaving it unattended upstairs while he was standing outside the building's entrance."). It

beggars belief that Mr. Williams could have intentionally placed his backpack on the third floor

and was watching outside to make sure no one left with it, but could not have known that Officer

Solem was referring to his backpack when Officer Solem discovered a backpack in an otherwise

empty hallway on the third floor. *See* Ex. 1 to Def.'s Mot. at 00:13.

More importantly, Mr. Williams offers no support for the premise that, to disclaim his

privacy interest in the backpack, the backpack must have first come within his view. Consider,

for instance, the scenario in *United States v. Ruiz*, 935 F.2d 982 (8th Cir. 1991). After the

appellant in *Ruiz* placed his two pieces of luggage into the trunk of a blue Chevrolet and got into

the passenger seat of a white Pontiac, police officers stopped both cars. 935 F.2d at 983. A

detective then asked to search the appellant's luggage, "referring to the two pieces of luggage

that were in the trunk of the Chevrolet." *Id.* The detective told the appellant that "he saw [the

appellant] place the two bags in the Chevrolet." *Id.*  But the appellant responded that the detective was "mistaken" and stated that his bag was in the Pontiac. *Id.*  After the driver of the Chevrolet gave officers permission to search the car, the detective then executed the search of the Chevrolet and found two pieces of luggage in the trunk, one of which contained cocaine. *Id.* Although the appellant was seated in the detective's squad car facing the Chevrolet and its driver, and could see the driver talking to the police, he "did not object to the search of the Chevrolet." *Id.*  The Eighth Circuit affirmed the district court's finding that the appellant had abandoned his interest in the luggage by denying ownership to the detective. *Id.* at 984.  Noting among other factors that the appellant had placed the luggage in the Chevrolet and then got into the Pontiac, the Eighth Circuit concluded that "[b]oth [the appellant's] words and actions support the district court's conclusion that he intended to abandon the luggage." *Id.* at 984–85.  At no point did the Eighth Circuit note that the luggage had to first come into the appellant's view *before* he could disclaim it.  His statements denying ownership of the luggage sufficed for a finding of abandonment even though they preceded the detective's search of the Chevrolet, which then brought the luggage into view.

Mr. Williams has not offered any rationale for why his case should be treated differently. As averred by Mr. Williams himself, he knew that he had a backpack that he had left in the third floor hallway.  *See* Def.'s Suppl. Br. at 7, 12.  When Officer Solem asked about a backpack, Mr. Williams could have asked for clarification or requested to see the backpack if he was unsure as to what backpack Officer Solem was referring.  He did not do so; he immediately denied ownership.  Absent any precedent or rationale counseling otherwise, the Court does not agree that a defendant must first see an item to disclaim it for abandonment purposes.

Given Mr. Williams's explicit denial of his privacy interest in the backpack, the cases

cited by Mr. Williams in support of the premise that his backpack was merely unattended, rather

than abandoned, are inapposite.  *See United States v. Voice*, 622 F.3d 870, 877–78 & n.3 (8th

Cir. 2010) (distinguishing case from scenario involving searches of closed containers "in plain

view from a common street or hallway" and noting that the government "presented no evidence

that [the appellant] denied ownership of the luggage"); *State v. Mooney*, 218 Conn. 85, 588 A.2d

145, 155–56 (1991) (limiting analysis to the "unique factual circumstances" of the case,

including that "the closed containers were found by the police in a secluded place that they knew

the defendant regarded as his home"); *United States v. Boswell*, 347 A.2d 270, 272 (D.C. 1975)

(describing how a police detective, after observing the appellee carrying a wrapped object and

placing the object in a hallway before going next door to make a phone call, then lifted the

blanket); *People v. Kelly*, 172 A.D.2d 458, 458 (N.Y. App. Div. 1991) (describing how a police

officer observed the defendant place a paper bag in an area of lobby wall before walking away).

In contrast with each of these cases, the "objective facts available to the investigating

officers" pointed to the backpack having been abandoned when Officer Solem searched it.

*Wilkins*, 538 F. Supp. 3d at 93.  As Mr. Williams emphasizes, the officers did not at any point

see Mr. Williams with the backpack, nor did Officer Solem find the backpack under

circumstances that suggested that Mr. Williams may have been living in the third floor hallway

and might have had a privacy interest in items located in that hallway.  Thus, not only were the

officers not put on notice that Mr. Williams might have a privacy interest in the backpack, but

Mr. Williams then also explicitly denied ownership.  Considering the "totality of the

circumstances," including that Mr. Williams both "denied ownership of the property and . . .

physically relinquished the property," the Court concludes that Mr. Williams abandoned the backpack before Officer Solem's search.  *United States v. Liu*, 180 F.3d 957, 960 (8th Cir. 1999).

### b.  Reassertion of Privacy Interest

The trickier question, then, is whether Mr. Williams at some point in the interaction with the officers—particularly after Officer Solem brought the backpack down to the second floor and into Mr. Williams's view, and before Officer Thermidor again searched the backpack and found the gun in one of its pockets—could have asserted ownership over, and thus his expectation of privacy in, the backpack.  Here, too, the Court agrees with the Government that Mr. Williams did not reassert a privacy interest in his backpack.

As both parties acknowledge, they have not identified any cases directly on point here.  *See* Def.'s Suppl. Br. at 14; Gov't's Suppl. Br. at 6.  And those cases that they do cite are factually distinguishable from the instant situation.  For example, Mr. Williams turns to *United States v. Burnette*, 698 F.2d 1038 (9th Cir. 1983), wherein an officer investigating a robbery had stopped one of the appellants, who had been holding a purse.  *Id.* at 1043, 1047.  The appellant, upon being stopped, "spontaneously stated that '[she] just found this purse.'"  *Id.* at 1043.  But after being asked by the officer for identification, the appellant pulled a traffic court summons bearing her name from the purse and also "stated that her identification was in her wallet and that her wallet was in 'her purse.'"  *Id.*  The Ninth Circuit acknowledged that the appellant "initially disclaimed ownership of the purse," but concluded that "her subsequent conduct during the confrontation with [the officer] strongly indicated her intent to retain a 'reasonable expectation of privacy in the purse.'"  *Id.* at 1048.  Notably, the appellant at no point in the interaction with the officer "indicate[d] a desire to relinquish physical possession of the purse," but instead

"continued to hold the purse until it was physically removed from her possession by [the officer]." *Id.*

Mr. Williams also relies on *United States v. Dowler*, 940 F.2d 1539 (Table), 1991 WL 155987 (10th Cir. 1991), which involved officers' seizure of the appellant's property being held by the appellant's apartment manager, who had "agreed to store appellant's property until she could return to collect it and so removed the property from the apartment for that purpose." *Id.* at *2. The Tenth Circuit rejected the government's contention that the property had been abandoned, noting that not only were the officers aware that the apartment manager had been storing the appellant's property for her, but that the appellant had also tried to reclaim her property at the police station on the same day that it had been seized. *See id.* at *3.

Further, Mr. Williams cites two state court cases. In one, the Court of Appeals of Oregon concluded that the defendant, who initially denied ownership of a laptop bag but then later stated that he was watching it for a friend before officers opened the bag, had not relinquished his interests in the bag against unreasonable searches or seizures under the Constitution of Oregon. *See State v. Rowell*, 283 P.3d 454, 475–76 (Or. Ct. App. 2012). Even if he had first disclaimed his interest in the bag, the court found, "that initial disavowal was renounced when he claimed that he was watching the bag for someone else." *Id.* In the second case, the defendant initially denied throwing any item into the bushes, but then admitted to an officer that he had thrown his backpack into the bushes. *State v. Olson*, 900 N.W.2d 872 (Table), 2017 WL 2791355, at *1 (Wis. Ct. App. 2017). After the defendant retrieved the backpack and gave it to the officer, the officer opened the backpack, which contained marijuana. *Id.* Having reclaimed his ownership of the backpack, the Wisconsin state court concluded, the defendant had an expectation of privacy in its contents. *Id.* at *6.

But each of these cases cited by Mr. Williams is of limited applicability here.  Unlike the appellant in *Burnette* who held onto her purse, Mr. Williams relinquished his physical possession of the backpack.  *See* 698 F.2d at 1048.  The officers in *Dowler* knew that the apartment manager was storing the property for the appellant and "were thus aware of [the] appellant's intent to retain a reasonable expectation of privacy" in her property.  1991 WL 155987 at *3.  Mr. Williams did not have control over the backpack, nor did anyone else in his stead; he also, as previously established, expressly disclaimed his ownership.  And not only did the defendants in *Rowell* and *Olson* both make clear statements rescinding their denials of ownership, but a state court's interpretation of the Constitution is also not binding on a federal court.  *See John Doe CS v. Capuchin Franciscan Friars*, 520 F. Supp. 2d 1124, 1135 (E.D. Mo. 2007).  Moreover, a state court's "construction of its own state constitutional protections, even when they are derived from language nearly identical to that found in the federal constitution, is not binding" on a federal court's interpretation of the Constitution.  *United States v. Jaras*, 96 F.3d 764, 767 (5th Cir. 1996) (Barksdale, J., dissenting).

As Mr. Williams notes, however, various cases do suggest the possibility that a defendant, despite having previously denied ownership in an item, might nonetheless subsequently reassert his privacy interest in that item.  *See, e.g.*, *United States v. Nordling*, 804 F.2d 1466, 1469–70 (9th Cir. 1986) (rejecting the argument of a defendant, who had abandoned his tote bag, "that his later admission that he owned the bag constituted a reassertion of interest in the property"); *United States v. Crumble*, 878 F.3d 656, 660 (8th Cir. 2018) (finding that a defendant's statement the day after the police had already seized his cell phone "did not constitute a reassertion of a privacy interest in the abandoned cell phone").  Unfortunately, these cases do not analyze to any significant extent what, precisely, a defendant must do to reassert a

privacy interest in previously abandoned property, when he must take such action, and whether a defendant's reassertion of his interest may prevent officers who have already conducted a limited search or opened a closed item from searching the property further.

Even so, *Nordling* weighs against finding that Mr. Williams successfully reasserted a privacy interest in his backpack. In that case, the appellant left his tote bag under his seat and denied to officers, as they escorted him off a plane to question him, that he had any luggage or carry-on baggage that he wished to bring with him. 804 F.2d at 1468. While being questioned, and when confronted with the ticket agent's account that the appellant had carried a tote bag, the appellant again denied that he had luggage with him.[5] *Id.* Later, though, the appellant told officers that he had left a gray tote bag on the plane with his girlfriend. *Id.* at 1468, 1470. Subsequently, an airline employee turned the bag over to the officers, who searched it with the appellant's permission and found cocaine and the appellant's personal effects. *Id.* at 1469. The Ninth Circuit affirmed the district court's finding that the appellant had abandoned his tote bag "in light of the totality of the circumstances," including the two "important factors" of "denial of

---

[5] The Court also notes, for purposes of addressing Mr. Williams's argument that he could not have disclaimed his ownership of the backpack because he could not see the backpack to which Officer Solem was referring, that the appellant in *Nordling* was also not in view of the tote bag when he made this statement disclaiming his ownership of it. *See* 804 F.2d at 1468 (explaining that the appellant had left his tote bag on the plane and was being questioned at the Harbor Patrol office when making this statement of denial).

Mr. Williams might seek to distinguish *Nordling* from the scenario here, where Officer Solem asked Mr. Williams whether the backpack belonged to him even though he could not see it, on the basis that the officers in *Nordling* merely asked the appellant whether he had a bag at all. But the appellant in *Nordling* had been "confronted with the conflict between his statement and the report from the . . . ticket agent that he had a gray tote bag" before he "repeated his denial." 804 F.2d at 1469–70. Thus, whether directly or indirectly, the officers in *Nordling* asked the appellant whether he owned the tote bag. Similarly, the detective in *Ruiz* specifically confronted the appellant about having seen the appellant place two bags in the Chevrolet, and then the appellant denied that those bags were his. *See* 935 F.2d at 983. In both *Ruiz* and *Nordling*, the appellants were not merely stating that they had no baggage, but were disclaiming ownership of specific items without seeing them, as Mr. Williams did here.

ownership and physical relinquishment of the property." *Id.* The appellant had twice expressly denied having any carry-on baggage with him on the flight, and then "physically relinquished control of the tote bag when he left it on the airplane where anyone, including the [airline] employee who found it in Seattle, could have access to it." *Id.* at 1469–70. The Ninth Circuit also concluded that the district court's findings were not clearly erroneous when it concluded that the appellant's "admission of ownership in the course of later questioning did not constitute a reassertion of a privacy interest in the bag," given that he "disclaimed ownership and left the bag on the airplane in circumstances in which it was virtually certain that the bag would be opened, inspected and turned over to law enforcement authorities before he could possibly attempt to reexert physical control." *Id.* at 1470. Likewise, here, Mr. Williams disclaimed his ownership and physically relinquished his backpack, under circumstances in which it was "virtually certain" that the officers would open and inspect the backpack following his denial of ownership "before he could possibly attempt to reexert physical control." *Id.*

Mr. Williams's attempts at distinguishing *Nordling* must also fail. Although Mr. Williams emphasizes that he attempted to reassert ownership prior to Officer Thermidor's search, so too did the appellant in *Nordling*, who admitted that he owned the tote bag before officers even attained possession of the bag or searched it. *See id.* at 1468. And Officer Brattain's testimony as to his subsequent understanding of Mr. Williams's intentions is immaterial because the "subjective state of mind" of the officer is not the pertinent issue in an abandonment inquiry. *See United States v. Moskowitz*, 883 F.2d 1142, 1148 (2d Cir. 1989), *superseded by regul. as recognized in United States v. Castano*, 999 F.2d 615, 617 (2d Cir. 1993). Moreover, given that the appellant in *Nordling* explicitly and clearly claimed ownership of the tote bag, *see* 804 F.2d at 1468, he arguably had an even stronger case for reasserting

ownership than did Mr. Williams, considering the "objective facts available to the investigating officers," *Wilkins*, 538 F. Supp. 3d at 93 (citation omitted).  Thus, *Nordling* weighs in favor of concluding that Mr. Williams did not reassert his interest in the abandoned backpack so as to render Officer Thermidor's search unlawful.

In considering the unique issue presented here, the Court is further guided by *United States v. Witten*, 649 F. App'x 880 (11th Cir. 2016), which factually comes closer to the instant case than the cases cited by the parties.  In *Witten*, officers on patrol noticed that the appellant, who was carrying a backpack, matched the description of a suspected trespasser and "peeping tom."  649 F. App'x at 882.  After losing sight of the appellant, the officers eventually found him hiding in a bush, but he was no longer carrying his backpack.  *Id.* (emphasis in original).  When the officers asked the appellant where his backpack was, he "replied along the lines of his backpack was at *his* house or at *the* house, presumably the house he was standing in front of"— statements that the magistrate judge concluded "were meant to mislead the police and leave the impression that the backpack was located elsewhere."  *Id.*  Shortly afterwards, an officer found a backpack "underneath the porch of a house . . . and approximately 12 to 15 feet from where [the appellant] was hiding."  *Id.*  Then, "[a]fter officers began searching inside the backpack, Witten told officers to stop looking through his backpack; this was the first time Witten claimed ownership over the backpack."  *Id.*

The Eleventh Circuit affirmed the district court's denial of the appellant's motion to suppress, which had been based on the finding that the appellant had abandoned his backpack.  *Id.* at 885.  Noting that the appellant had "fled from the officers and hid his backpack under the porch of another person's house" and "attempted to deceive the officers by implying that his backpack was located elsewhere," the Eleventh Circuit determined that he "need not have

expressly disclaimed ownership of the bag because he effectively did so both by placing it away from his person and by stating it was at home." *Id.*  Importantly, the Eleventh Circuit did *not* expressly address whether the appellant may have reasserted his interest in the backpack, *see id.* at 885–86, even though the magistrate judge, whose report was then adopted by the district court, concluded that his "belated attempt to stop the officers from searching his bag [was] of no moment," *United States v. Witten*, No. 13-cr-10022, 2014 WL 3101912, at *11 (S.D. Fla. July 7, 2014), *aff'd*, 649 F. App'x 880 (11th Cir. 2016).  Indeed, the magistrate judge had explained that the "operative question [was the appellant's] expectation of privacy *at the time of the search,* not **after** the search had begun." *Id.* (emphasis in original).  In affirming the district court's decision, the Eleventh Circuit did not state that it found this analysis to be clearly erroneous.  *See Witten*, 649 F. App'x at 885–86.

Taken together, *Witten* and *Nordling* counsel in favor of concluding that Mr. Williams did not here reassert his interest in the backpack such that Officer Thermidor should not have searched the backpack further.  Even if, construing Mr. Williams's actions generously, Mr. Williams began attempting to reassert his interest in his backpack *before* Officer Thermidor began searching it—and Officer Thermidor was not, as was the officer in *Witten*, already mid-way through his search—at minimum the backpack had already been *seized* by the officers before Mr. Williams began his protestations.  *See Nordling*, 804 F.2d at 1469 ("The inquiry should focus on whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure.").  The officers had already begun searching the backpack, such that Mr. Williams could no longer reasonably have expected privacy in its contents; after all, if Officer Solem had proceeded further to open the remaining pockets of the backpack in his initial search, this

additional analysis about a potential reassertion of ownership by Mr. Williams would have been unnecessary.  Mr. Williams asks the Court to read between the lines of his distress that day to find that he reasserted his interest in the backpack, even though he did not, so far as the Court can discern, make any explicit statements claiming ownership over the backpack.  By contrast, a comparably clearer statement of ownership in *Nordling* did not suffice for reassertion of a privacy interest.  Bearing such considerations in mind, the Court finds Officers Solem and Thermidor's respective searches of the backpack to have been lawful.

Finally, Mr. Williams's contention that Officer Solem (and presumably, Officer Thermidor) should have first patted down the exterior of the backpack to check for weapons is inapposite here, given Mr. Williams's abandonment of the backpack.  *See* Def.'s Mot. at 6.  When conducting a *Terry* stop, an officer may conduct a "protective frisk" if that officer "has reason to believe, based on specific and articulable facts taken together with rational inferences from those facts, that [the officer] is dealing with an armed and dangerous individual."  *Wills*, 316 F. Supp. 3d at 444 (citation omitted and cleaned up).  As Mr. Williams states, it is also true that an officer may as part of a *Terry* stop frisk a bag or backpack, but "must begin with an exterior pat-down of the bag or backpack."  *Id.*  But Officers Solem and Thermidor's searches of the backpack did not occur as an extension of a *Terry* stop, based on the belief that Mr. Williams posed a danger to the officers.  Instead, Mr. Williams's abandonment of the backpack and any privacy interest he had in it gave the officers justification to not just frisk the backpack, but to search it, for the reasons explained above.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Amended Motion to Suppress Tangible Evidence (ECF No. 17) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

**SO ORDERED**.

Dated:  April 11, 2023                                    RUDOLPH CONTRERAS
                                                         United States District Judge